## WEBSTER *v.* STATE.

(Division A. April 5, 1943. Suggestion of Error Overruled May 3, 1943.)

[12 So. (2d) 533. No. 35274.]

**L. A. Whittington,** of Natchez, for appellant.

**Greek L. Rice**, Attorney General, by **R. O. Arrington**, Assistant Attorney General, for appellee.

Argued orally by **L. A. Whittington**, for appellant, and by **R. O. Arrington**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

Appellant was indicted for the murder of his wife, Ruth Webster, and one J. D. McGhee, all three being negroes. Appellant was granted a severance. This is an appeal from his conviction and a life sentence to the state penitentiary for murder of his wife.

His plea was self-defense, that he shot and killed his wife unintentionally and accidentally while justifiably shooting at McGhee in an effort to save himself from

real and apparent danger of losing his life or suffering great bodily harm at the hands of McGhee. It is not claimed that the wife was attempting to harm him. In fact, he says he did not know he had shot her.

He first contends on this appeal that the evidence shows conclusively that the killing of Ruth Webster was in the heat of passion under such circumstances as preclude his conviction of a greater crime than manslaughter. This requires a summary of the evidence.

Webster and his wife lived in what is described as a "shotgun" three-room house in the Town of Bude, Mississippi. A "shotgun" house means the rooms are in a straight row. Entrance to the premises was through a fence-gate into a small front yard; thence upon a front porch and through a door therefrom into the front room, some nine feet long and ten feet wide; thence by a partition door into the middle room, some twelve feet wide and ten feet long; and thence through a partition door into the kitchen, from which a door opened onto a small back yard, or garden, to the rear of which was a low fence and the family toilet.

Webster was the only eye-witness to the tragedy. His version of the events is this: On the night of July 4, 1942, about eleven o'clock, after he had been away in the Town of Bude some two and a half hours, he returned home. The house was dark. He entered the front door of the front room and turned on the electric light, and by that light he saw, through the door into the middle room, his wife and McGhee jump from the bed; that McGhee "grabbed" a single-barreled 410-gauge shotgun of appellant's, which was at the foot of the bed, "and started up with it towards me"; appellant continued to advance to and entered the middle room, grasped the gun in the hands of McGhee and they struggled over it; that the barrel of the gun struck the wall or floor of the middle room and exploded; that during this time appellant opened a drawer of a dresser in this room and got therefrom his

pistol and shot at McGhee ten times (that being the load capacity of the pistol) as fast as he could pull the trigger; that McGhee fell to the floor, and appellant immediately dropped his pistol onto the floor, left the house, turning off the front room light as he departed; that a short distance from the house he saw one Clark and Russell attempting to start an automobile, and he approached and told them that he wanted them to take him to the police; that he had had a little trouble with McGhee; that "there had been some shooting in the house"; that he did not tell them he had killed anyone; that Clark and Russell, being skeptical or curious, instead of taking him to the police, proceeded with him to the house; they entered the front, turning on the light, and viewed the body of McGhee on the floor in the right hand corner of the middle room; that within a few moments Clark carried him in the automobile to the police.

He also testified that when McGhee got from the bed he thought he observed that his pants were open; that from all of this he concluded McGhee and his wife were engaged in illicit relations; that he did not know when, or whether, his wife left the room; that there was no outcry and not a word was said during this affray; that some two weeks prior to this he saw McGhee come from his home and he told him not to come back, else he, appellant, would give McGhee trouble, and McGhee replied that he would not come back but that he could give Webster as much trouble as Webster could give him.

Clark and Russell testified that about eleven o'clock that night, as they were proceeding in an automobile about one hundred yards from the home of appellant, he flagged them to a stop, and asked them to take him to the police, and when they inquired why, he said he had killed his wife and McGhee, and when asked for a reason, said he had caught them in the bed, and when they expressed doubt, told them to come to his house and he would show them; that they immediately went to the house; it was

dark; turned on the front light and proceeded to the middle room. There they saw McGhee on the floor in the right hand corner of the middle room, groaning and bleeding, and when spoken to by one of them, he did not answer; that appellant stood near the feet of McGhee and had in his hand an open knife and in his hip pocket an ice-pick, both of which had blood upon them; that they inquired of appellant the whereabouts of his wife and he made no reply. Clark then carried appellant to the police in the automobile and Russell proceeded to the home of the father of McGhee to notify him.

People began to gather at the house. A doctor arrived within some thirty minutes but McGhee was dead. A search was made for the wife. Her body was found behind the toilet and beyond the back fence. She was dead. The undertaker testified that McGhee had received one pistol shot in the head and one in the abdomen; two cuts in his chest and two stabs in his right shoulder and two stabs in his right jaw and there was a knot on his left forehead; that the cuts appeared to have been made with a knife and the stabs with an ice-pick. The doctor said "there were two bullet holes just above his heart and just below there were two more and one bullet struck his ribs," and, as he recalled, there was a pistol bullet wound in the head; that, as he remembered, McGhee had been shot five times with a pistol and there was a gunshot wound in the chest, but he did not think any of the wounds were made with a knife or ice-pick.

The undertaker testified that Ruth Webster had received six pistol bullet wounds in the chest, and a shotgun wound in the right shoulder; that he removed some of the shot from the shoulder. The doctor testified that the woman had four pistol shots in the chest and a deep gash in the top of her head, which could have been made by a lick with the gun. Some of the discrepancies in the testimony of the undertaker and the doctor as to the number and nature of the wounds may be accounted for be-

cause of the fact that the examination by the doctor was hurriedly made, with a crowd about, and when the victims were completely dressed, and that by the undertaker was made later when they were completely undressed. They appear immaterial except those claimed to have been made by knife and pick. Other witnesses testified to the wounds as they saw them while the bodies were dressed and lying on the floor in the middle room after Ruth Webster had been brought into that room.

In addition to the foregoing, the uncontradicted proof is that there were powder burns on the woman and none on the man; that they were both completely dressed, with all garments fastened and buttoned and intact; that the bed in the middle room was smooth and unruffled, with freshly laundered clothing piled thereon, and that there was no indication whatever that anyone had been upon that bed; that the gun was lying across the bed and the barrel was bent. No witness mentioned seeing the pistol on the floor where appellant said he threw it and nothing has been heard of it since.

This was Saturday night. The automobile which was being used by Russell and Clark, and in which appellant rode to surrender to the police, belonged to one Campbell. He testified that about sunrise Sunday morning, having heard of this affair, he went forth to look for his automobile, and found it parked at Clark's house, and in it was a knife and ice-pick with blood upon them; that during the afternoon of that day a brother of appellant came to his house and got them. The brother denied he did that. Clark testified Campbell showed the knife and pick to him and that it was the same knife appellant had in his hand when standing at the feet of McGhee in the middle room.

In addition, one Harris testified that on that night, around nine o'clock, he passed the home of appellant, and that a young man (McGhee was twenty to twenty-two years of age), not known to him, was standing outside of

the front gate, and appellant was insisting that he come into the house, and this man was protesting that he did not have time, and that appellant, who was known to Harris, put a pistol against the side of this man and forced him to go into the house, and that soon thereafter, when Harris had gotten a short distance from the house, he heard nine pistol shots. There is a noticeable difference in time between this and that of the tragedy. A witness for appellant testified that Harris was in Bude about the time Harris said he was, but placed him in Meadville, some two miles from Bude, at eleven o'clock, about which time the tragedy became known to the public and at which time appellant testified it occurred. No witness, other than appellant and Harris, claims to have heard any shots.

It is at once evident, under these circumstances, that the lower court was correct in not limiting the jury to a conviction of manslaughter committed in the heat of passion. The evidence of Harris alone, although far from convincing, yet not unreasonable and unbelievable, would itself refute that conclusion, especially in connection with appellant's threat against McGhee if he came back to his house. Admitting, but not deciding, that the circumstances as appellant pictured them would so limit the gravity of his crime (Rowland v. State, 83 Miss. 483, 35 So. 826; 1 Ann. Cas. 135), the undisputed evidence as to the condition of the bed refutes his statement that his wife and McGhee were upon the bed, and the condition of their dress when their bodies were found shows that they were not engaged in illicit relations. The body of the wife was found beyond the backyard over a fence. How she could have been thus shot and wounded when in the middle room and thereafter gone to the place where she was found is not understandable. How she was shot four to six times with a pistol in the chest and in the shoulder with a shotgun and hit over the head, all accidentally while appellant was shooting at McGhee, is un-

explained and seemingly unexplainable. There were powder burns upon her. Appellant says he did all of the shooting in the middle room. The jury could have believed that after appellant had finished shooting McGhee he followed his wife to the rear of the yard and beyond the fence and there struck, shot and killed her. Appellant says he never had possession of the gun. It was on the bed in the middle room. It is quite certain neither Ruth Webster nor McGhee placed it there. The barrel of the gun was bent. Appellant testified that he received only a slight scratch in this melee. No one struck him with the gun. He does not claim that to be true. Even though appellant's version, if true, brings him within the rule announced in the Rowland case, supra, which we do not decide, and which, to say the least, is extremely doubtful, the jury would have been amply justified in rejecting a large part of it. The crime cannot be limited to manslaughter as being committed in the heat of passion.

Appellant next contends he could not be convicted of any crime, since he was the only eye-witness and his testimony, as given, brings him within the rule announced in Weathersby v. State, 165 Miss. 207, 147 So. 481, where it is said: "It has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." The foregoing summary shows that in several vital particulars appellant is contradicted by the physical facts and by the testimony of other witnesses, and the jury might well have concluded that much of his testimony was unreasonable. Appellant is not within the stated rule.

Appellant presented to the lower court a motion for a continuance of his trial because of the absence of one Cameron, a witness. The motion was denied. That is assigned as error. The motion stated that Cameron if

present would testify that on the night of the tragedy he approached appellant in the Town of Bude and wanted to borrow from appellant some money with which to engage in a card game; that appellant did not have the money on his person but agreed to go home and get it and lend it to Cameron, and it was for that purpose that appellant went to his home that night; that Cameron stopped and remained outside the front gate; "that at that time there were no lights on in said house so far as the witness saw; and the said defendant walked up on the porch, opened the front door and when inside the front door turned on the ceiling light; that he then heard the wife of the defendant say something to the defendant about coming in at that time of night and almost immediately a scuffle occurred about the opening of the door leading from the front room into the next room; that since there were no lights on in the next room the witness could not see who was scuffling with the defendant but almost at once a shot was fired from inside the dark room and then several shots that sounded like pistol shots; that shortly the defendant came out of the house and told the witness that he had been attacked by a man from his bedroom and that he had to shoot towards the dark; that he was certain he saw his wife in the room but did not know whether she was shot or not . . .;" that the witness never heard "any quarrel or racket other than the scuffle that occurred just at the door leading from the front room to the next room and the shots that immediately followed said scuffle . . ." The motion states appellant was informed that Cameron was in the military service of the United States, "but that it is reasonable to assume that he could be had at a later term of this court." No proof was taken upon this motion. There was, in fact, no proof Cameron was in the military service or that he would ever be available at a subsequent term of court. In addition, it is not seen how this testimony would have been of aid to appellant. In fact, had Cameron testified to hearing the foregoing

conversation between appellant and his wife, it would have been in direct conflict with the testimony of appellant that not a word was said by anyone during this entire drama and this conflict, as well as the import of such a conversation, would have been very damaging to appellant. There are other conflicts between the testimony Cameron would have given and that which appellant did give, none of which would have been of aid to the cause of appellant. The motion was addressed to the sound discretion of the trial judge and we cannot say that there was a manifest abuse of such discretion. It follows that this case should be, and it is hereby, affirmed.

Affirmed.