PITTS v. STATE.

Division B. Mar. 26, 1951.

No. 37857 (51 So. (2d) 448)

270

J. Ed. Franklin and D. M. Lee, for appellant.

**Joe T. Patterson,** Assistant Attorney General, for appellee.

**Ethridge, C.**

Appellant, Ronald Nelson Pitts, was convicted in the Circuit Court of the First Judicial District of Hinds County, Mississippi, of the murder of P. W. Henderson and sentenced to life imprisonment in the state penitentiary. He urges as reversible errors in the court below (1) the denial to him of a peremptory instruction, on the ground that his version as the sole eyewitness must be accepted, it being reasonable and not materially contradicted, under which version he acted in self-defense; (2) an instruction granted the state depriving him of his plea of self-defense if the jury found certain facts; and (3) certain closing arguments of the district attorney to the jury. In affirming the judgment of the circuit court, some detailed consideration of the testimony in the lengthy trial is necessary.

### Summary of Evidence

Deceased, P. W. Henderson, about 46 years of age, was transferred in January, 1948 by his employer, The Electrolux Corporation, from Atlanta to Jackson, Missis-

sippi. He was factory branch manager of the Jackson office. He had about 50 people working under him. His district included all of Mississippi except small strips off of the south and north ends of the state. He had four children, the oldest of whom was 23 years of age at the time of his death in the early morning of June 25, 1949. His second youngest child was Anna, who was 16 years of age and had just completed her sophomore year in Central High School at that time. After school was out in June, 1948, Henderson moved his wife, and Anna, and their youngest child to Jackson. For several months prior to June, 1949, this family lived in a home at 440 Valley Street in Jackson. Valley Street runs North and South, and their home was on the East side of the street, facing West. It is a three-bedroom house with an unfinished, half-story attic which is accessible by use of a graduated disappearing stairway in a hall in the central part of the house. It was around this hall, stairway, and attic that the violent events occurred in which Henderson was killed.

Appellant Pitts was 18 years of age on February 4, 1949. He was then a junior in Central High School in Jackson. He lived with his parents on South President Street. His mother worked as a switchboard operator at the Baptist Hospital; his father was a traveling salesman. They have three children, appellant being the oldest. Appellant was a regular attendant and member of the same church to which the Hendersons belonged, and all of them were active in its affairs.

Pitts first met Anna Henderson at a social gathering of young people in the early part of February, 1949. They soon became very much infatuated with each other and Pitts said very much in love. He visited frequently in the Henderson home and, although Mrs. Henderson stated that she had never invited him to their home and knew of no invitations to him, it is apparent that in February and March of 1949, Pitts was there frequently,

occasionally dining with the family, and on several occasions Mr. or Mrs. Henderson drove Pitts home at the end of an evening's visit. Anna and Pitts "went together every chance we could get for a month," and at that time they agreed, he said, to become engaged and to later marry. Mrs. Henderson testified that she had no objection to defendant going with Anna when they first started, but that he objected very strongly to the family's rules prohibiting Anna from having unchaperoned dates and limiting her to one date a week while in school; that he did not conform to those rules and "that he was very arrogant in telling us that we were the only parents he ever heard tell of taking that stand, that we were just psycho-neurotics to have that feeling." When the Hendersons undertook to reprove Pitts, she said Pitts advised them that "it was his duty to stand up for Anna's rights . . ." After this attitude had continued for a while, Mrs. Henderson said that they asked Pitts not to come to the house at all but that "he began annoying us on the phone". He would insist on discussing the family's attitude about discipline for Anna and "told us he just didn't let anybody push him around." Deceased finally forbade Pitts from telephoning the house, and told him that if Anna desired to talk with him, she could. Pitts advised them that "he was warning us that if he found out we were interfering with her coming to the telephone, that he was warning us, and we could consider that warning with a pop gun."

In the meantime, appellant said that he and Anna had become intimate with one another, had had sexual intercourse on a number of occasions, and these events began to occur in the latter part of March shortly after they decided to become engaged. Appellant testified that about a week before school was out, which was June 6, 1949, Anna told him that she was afraid she was pregnant, and he advised her that they would have to get married right away.

Early in April, Mr. and Mrs. Henderson took a six-day trip to New York City, and when they returned they found that Anna was in an extremely nervous and unhealthy condition. She "began to cry most of the time and begged not to go to school . . . . She said she just couldn't stand his arrogance over her." She asked her mother to let her go to school in Atlanta and live with her brother's family. Deceased and his wife considered referring the matter to juvenile correction authorities, but they decided against this. Mrs. Henderson said "to get away from the strain of his threats and domineering and humiliation," she and Anna and another daughter drove to Atlanta after school was out in early June to visit relatives and friends. They stayed there about 10 days, at which time Henderson telephoned Mrs. Henderson, advising her that appellant was continuing to bother him about Anna's address, and told them to drive up to South Carolina and other points to avoid him.

Pitts testified that he and Anna told both his parents and the Hendersons that they wanted to get married and that this was the first time he had seen Mr. Henderson. This occurred apparently sometime in April. He stated that the only objection then raised by the Hendersons was that Anna was too young and that they should wait at least a year, but that two years would be better until Anna could finish high school. They were friendly to him at that time. He stated that he was always welcomed at the Hendersons' home and that Mrs. Henderson never indicated that she wanted him to leave. He had the complete run of the house and was free to come and go as he pleased. On several occasions, for example, he went out to their home before Anna had returned and "walked in and sat down waiting for them to come home." They "did not seem to mind it in the least." Originally he and Anna had agreed to wait for at least a year to get married, he said, but when in the latter part

of May Anna told him she thought she was pregnant, they decided to get married very soon. On Friday a week before the shooting, he told Henderson in the latter's office that he thought Anna was pregnant and they wanted to get married. Henderson told him he first wanted to talk to Anna. Pitts testified that on Saturday Henderson called him and told him that he, Henderson, wanted two weeks to make up his mind, and Pitts agreed not to see Anna during these two weeks, but got permission to telephone her once, which he did the same day. On that Saturday or Sunday, Anna and her mother drove to Atlanta. Pitts said he heard of it on Sunday through a friend. Pitts telephoned Henderson on Monday before the shooting, and Henderson told him they were on a short vacation.

On Wednesday morning, Pitts said he again called Henderson, and he was evasive about where Anna was, but promised to call Pitts back when he "found out about certain things." On Friday morning, June 24, between 7:30 and 8:15 A. M., Henderson telephoned Pitts at his home, Pitts testified, and said: "I just called to tell you that everything has been taken care of, Anna is straightened out, and as far as you are concerned, you can go straight to hell." Pitts was extremely upset and began crying, but around 9:30 A. M. he left his house and went to Henderson's office. On going in his office, he asked Henderson "what he meant by the telephone conversation that morning." He replied, "I ought to know that but that it wasn't any of my business if I didn't know." Pitts then asked where Anna was and Henderson advised him he was not going to tell him. Pitts stated that he then accused Henderson of sending Anna away so that she could have an abortion, and that he was going to have the matter investigated by the authorities, that he wanted to marry Anna; that during the first part of their conversation that morning, they talked "rather loudly . . . but then we cooled down." Stringer, a business associate

of Henderson's, was around the office at that time but did not hear the details of the conversation. However, he said he heard there was some "disagreement" and "controversy" between Pitts and Henderson that morning. Before the conversation was over, lasting about 15 minutes, Pitts testified that Henderson told him he didn't have Anna's address at the office, but he did at the house, and that "you come to my house sometime and I will give you the address where Anna is and you can go find her, as far as I am concerned, I am through after that."

On leaving Henderson's office, Pitts caught a bus, went to the Henderson home and looked in the mail box to see if there was a letter from Mrs. Henderson from which he could get Anna's address. The box was empty, but he met a mail man who let him see the return address on a letter from Mrs. Henderson in his possession. When asked why he was in such a hurry to get the address when Henderson had promised that he would give it to him, Pitts said "I didn't trust Mr. Henderson. He had been playing cat and mouse with me all of the time, deceiving me in every way. I was afraid of him, I knew he had a violent temper when he got mad." Pitts returned to his home around 11:30 A. M., June 24, and had dinner with his mother. He advised her that Henderson had told him to come out and get Anna's address, and she warned him to be careful because Henderson might try to kill him. Pitts then left his home, went to the Chamber of Commerce office, and looked up in the Atlanta telephone directory the name of a person living next to the address he had obtained from the envelope, but a call to Atlanta to that address failed to locate Anna. He then telephoned his mother around 4:30 P. M. and told her he was going to Henderson's house to get Anna's address, and she again warned him. He then got dressed and testified that he had started out of the door when he remembered "that I

was deathly afraid of Mr. Henderson. He had a violent temper.'' He said he didn't want to have any trouble, and that was the only reason he picked up the Victor 38 caliber pistol, because ''in case he attacked, I intended to ward him off until I had time to get away.'' The pistol, holding five cartridges, then contained three cartridges. Pitts stated that he picked up some cartridges and put them in his pocket.

He then got on the bus and went to the Henderson home around 5:30 P. M., June 24, 1949. It was summer and bright daylight. He stated he made no effort to conceal himself, went directly to the front door and rang a bell, and finding no one there and that door locked, he went around the south side of the house by Anna's room to see if she was there. However, it is apparent from the record that he was convinced already that Anna was out of town. He stated, however, he had hoped the Henderson family might have returned. He then walked on around the south and east sides of the house, passing a large shrub, and walked up the back steps on the north-east corner leading to the back screen door, on which he rapped a few times, he testified, and tested it and found it unlatched. He did not enter the house at that time. Mrs. McDaniels, a neighbor, who lived in the house immediately north, testified that she was sitting on her back steps shelling beans when Pitts went to the back door, that she did not think that he saw her until after he tried the door, and that he pulled it, it did not open and it was apparently latched from the inside. She said that Pitts then turned around, saw her, and asked her whether the Hendersons were home, to which she replied that they were not but that Mr. Henderson came in around 6 o'clock or later. Pitts said he saw her when he first came around the house. Pitts said he walked back around the opposite, or north and west, sides of the house but Mrs. McDaniels said he returned the way he came, by the shrub and the south side. Pitts said

that he sat on the front concrete steps for about 30 minutes waiting for Henderson to get home, and that all he wanted was Anna's address. After about 30 minutes he decided it would be more comfortable if he went inside and sat in the living room. He got up and walked along the driveway on the north side of the house to the back door, which he said was unlatched, and went in the living room, sat down and waited thirty minutes. He turned on the lights. He said he made no effort whatever to conceal himself. He then decided that Henderson might be on a business trip and late in getting in, so he went into the den, which is to the left of the living room, going in the front door, and looked through some letters trying to find Anna's address. He also went into Anna's room and put a few letters from her school friends in Atlanta in his pocket, "just in case Mr. Henderson had told me a lie about giving me the address . . ." He noticed his picture turned face down on the table by Anna's bed, so he set it back up. He then went back to the den and fell across the day bed there and unintentionally went to sleep, awaking about 11-11:30 P. M. He was tired and had not slept much for the past few days. He stated that several lights were on in the house from the time he entered it until he went into the attic, and that he had no idea or reason for injuring Henderson. He only wanted to get Anna's address. He said he did not believe Henderson would give it to him, but that he hoped he would.

When he awakened, his "nerves were completely shot, overloaded", and he was exhausted. He said he was afraid of staying on the day bed because "Henderson might come in and might hurt me while I was there asleep." He took one of the pillows and went over to the disappearing stairway in the hall leading to the attic, pulled the chain to open the door to the attic, which in turn pulled the ladder down, and threw the pillow up through the opening. He said he then remembered an

old shotgun of Henderson's back in the store room, which was the bedroom on the Southeast corner, so he went back, saw it was unloaded, and carried that into the attic with him. He did not know whether Henderson had any shells for it downstairs, so he said he took it with him to prevent Henderson from using it if he was so inclined. He turned out all lights in the house, closed the trap door to the attic and lay down. Assuming Pitts waked up between 11 to 11:30 P. M., it must have been close to 12 P. M. before he went up into the attic. The shooting occurred at about 12:45 A. M., June 25.

The hallway in which the trap door is located is about 3 feet 7 inches wide, 16 feet 9 inches in length. It runs north and south. Immediately to the north of it is the dining room separated from the hall by a casement, door frame, but there is no door between the hall and the dining room. Immediately to the east of the dining room is the kitchen. The disappearing stairway in question is concealed by a door in the ceiling which is hinged on the west side of the aperture for the door. Above that door is the stairway which operates on a fulcrum, cable and spring.

Pitts stated that in fifteen or twenty minutes he became hot and thirsty in the attic, and went down stairs to get water out of the ice box. He picked up the south end of the ladder and pushed down on the trap door, and as the ladder caught he pressed the door down with his foot. At that time this method worked all right. He went to the kitchen, got a drink of water and rounded the corner from the dining room to the hallway. He said he was very sleepy. He "tripped over a chair setting by the telephone and I got twisted up in the wires and brought the whole thing down with me and I ripped the telephone out of the wall." He said this was accidental. The telephone wire and wall plug introduced in evidence were completely pulled loose from the wire in the wall, and the latter wire was shredded at the end. He put the

telephone back on the hook and set it up and then went back into the attic and closed the trap door. Pitts said the shotgun was and remained unloaded. He only wanted to prevent Henderson from trying to use it. At this time all of the lights in the house were off. After he returned to the attic only a short time could have elapsed before Henderson and Stringer came into the house. This must have been shortly before 12:30 A.M., June 25. Pitts was half asleep when he heard a car drive up outside and two men get out. They were Henderson, the deceased, and A. C. Stringer, a business associate of Henderson.

Stringer said that he and Henderson had been on a business trip to Natchez that day, and that Henderson had invited him to spend the night at his house, since the Henderson family was gone. He and Henderson got out of the car. Henderson unlocked the front door. No lights were on in the house. They turned them on and went into the kitchen to fix some ham and eggs and coffee. Stringer went to the telephone to make a call when he noticed the telephone was pulled loose from the wall underneath the telephone stand. They thought that someone had been in the house, so they turned on all of the lights, searched the place, and found the shotgun missing. Henderson told Stringer that he thought that Pitts had been in the house. Pitts said Henderson said, "G— D—— that Pitts, he has been here. Let's look around and see if anything has been taken." Henderson left in his car to call the police, and was gone about fifteen minutes. When he returned, he brought with him his 45 caliber Colt automatic pistol which he kept when travelling on the front seat of his car. He originally started to call Pitts' mother and tell her, but Stringer advised against that. Stringer suggested opening the trap door, but Henderson said, "Wait until the police get here." In the meantime, Pitts was in the darkened attic, heard this conversation, and heard Henderson

say he was going to call the police. He also admitted that Henderson had originally started to call Pitts' home. After Henderson returned from calling the police, Pitts said he decided not to stay in the attic any longer. He wanted to talk to Henderson and get Anna's address. He began moving around. Stringer said they heard a shuffling noise in the attic. Henderson, talking in a loud and excited voice, told him to "run next door and call the police." Stringer ran over to the McDaniels' house to the north and next door, awakened them, and had McDaniels call the police.

Pitts' version is as follows: He turned on the light in the attic, picked up the south end of the ladder, and forced the ladder halfway down, when it got stuck and would not move any further. At that point he could plainly see north some distance in the hallway and into the dining room. When Pitts first started to open the trap door, Henderson told Stringer, "Run call the police," and "he is in the attic," and Stringer ran out the back door. Thirty to fifty seconds then elapsed before the shooting. Henderson walked into the hallway, six or seven feet away, and said, "Ronnie, come down from there right now." During these incidents and the shooting, Stringer was next door in the McDaniels' yard, getting them to call the police. In answer to Henderson's direction, Pitts said that he told him he was "trying to but the ladder stuck." He said that when he was saying that, Henderson raised the pistol he had had behind him all of the time, pointed it directly at him and pulled the trigger. There was a click, apparently because Henderson had no cartridge in the chamber. The gun only snapped. The trap door was completely open and the ladder was halfway down and jammed. Pitts said he was right at the edge of the door on the south side facing downward toward Henderson and trying to get the ladder unstuck. The light in the attic, as well as downstairs, was on. Pitts' gun was loaded and lying on the

floor beside him. He said he intended to throw it down to Henderson before he went down. Henderson looked startled when his gun did not go off, and stepped back out of the hallway behind the facing of the wall in the dining room. Pitts then picked his gun up with his left hand. He heard a snapping sound indicating Henderson was inserting a cartridge in the chamber. Pitts said, ''for God's sake, don't shoot, and I will come down and talk to you.'' Henderson stepped from behind the door facing, standing just in the dining room from the hallway, raised his pistol and said ''G— D——— you, I have you right where I want you now,'' and fired at Pitts. The bullet ploughed at a thirty degree angle into the east side of the molding around the opening for the attic door, missing Pitts by several feet. Pitts said when Henderson shot the first time, Pitts had his gun in his lap, so he must have been sitting on the attic floor with his feet on the ladder. Pitts fell back against the ladder, and Henderson stepped back a little more and started to pull his pistol down again at Pitts. The latter then grabbed his pistol with his left hand and ''nearly fell. I intended to throw it down to Mr. Henderson.'' Pitts had not started down the ladder, but apparently was standing on the edge of the attic floor, with his right hand on the ladder to steady himself. As Henderson put his pistol down for a third try and second shot at Pitts, Pitts, wanting only to scare Henderson and delay him enough so Pitts could get back in the attic, fired in Henderson's general direction. He had no time to retreat or get out of the way. Pitts held his pistol loosely, and, as Henderson was bringing his gun down for that intended second actual shot, Pitts fired his pistol, which jerked out of his hand and fell to the floor of the hall. Henderson staggered back into the dining room, fell across a table, knocked a chair aside, and fell on his face and stomach. Pitts gave the ladder a hard pull, and it fell off of its moorings and down to the floor. He

jumped down, picked his pistol up, ran out the front door and about two hours thereafter went to his home, in front of which he was arrested by the officers. Pitts said he intended to tell his mother about the incident, and then give himself up to the police. He did not know when he left the house on Valley Street whether Henderson was seriously shot or not.

The foregoing paragraph is a substantial summary of Pitts' own account of the actual shooting. Neither Stringer nor anyone other than Pitts and the deceased saw it. Stringer saw a man running fast out of the front door of the house, and when he returned immediately he found Henderson lying on the floor in the dining room dead, shot through the left eyebrow, about an inch from the bridge of his nose. Henderson's shot in the frame of the trap door was with a 45 caliber pistol, and Pitts' shot was with a 38 caliber pistol. Presumably, the 45 would make the heavier sound. Stringer could not remember which shot was the first. Pitts said that his shot followed that of Henderson "very close together." Stringer said the two shots were "almost together." Kimbrough, a neighbor, said the first shot was a heavy, loud shot, the second, not quite as loud, but that they were practically simultaneous, two or three seconds apart.

J. K. Currie, Jackson policeman, testified that he and other officers interrogated Pitts after his arrest, and that Pitts said that he had gone to the Henderson home 'to have it out with Mr. Henderson", and that "it was because of Anna." J. P. Shipp, city detective, stated that after Pitts' arrest he asked him how the shooting occurred. Pitts told him that "he started to open it (attic door) once and that Mr. Henderson told him to get back and stay back and he closed it, and then he hollered that he was coming out. He raised the ladder again, pushed the door, and the shots were fired almost together." Pitts denied these statements. Pitts told Shipp that he

raised the ladder with his right hand and had the pistol in his left hand, and that Henderson shot first but the "shots were almost simultaneous."

When Stringer returned to the house after the shooting the lights were on in the attic and also in the dining room and kitchen. Henderson's pistol was found about a foot from his right hand. His body was about three feet in the dining room from the hall, his head to the northwest and his feet to the southeast. When Pitts was arrested, the pistol was found on him, together with the expended cartridge. Several witnesses for the state testified that two or three inches below the latch on the back screen door was a fresh cut in that screen, indicating a hole had been made in it by a small knife or similar device. Appellant asserted the screen was unlatched, and denied that he punched the screen in order to raise the latch. There was some evidence that the screen on the door was rotted at various places.

On rebuttal for the state a doctor from Atlanta testified that on August 1, 1949, he had made a physical examination of Anna Henderson, and in his opinion she was not and never had been pregnant. This evidence apparently was designed to discredit Pitts' testimony to the effect that Anna was pregnant, that they, therefore, asked Henderson to let them get married right away, and that because of her pregnancy and his anger, Henderson had a motive to want to kill Pitts.

The appellant produced a Negro witness named High, who said he operated a business of training labor leaders; that he had known Henderson for about a year prior to his death, and that he had loaned Henderson money in amounts of $50 to $100 from time to time, taking no notes to evidence the debts. He said that, several days before the shooting, Henderson told him of how Pitts had wrecked their home, and that Henderson asked him to kill Pitts for him or to get somebody to do it, and that he refused. Another witness, Brown, a white man, testi-

fied that Henderson stopped him on the square in Raymond on or about June 14 and offered him "$500 to bump off Pitts for him, and that he refused. This witness admitted that he had never seen or heard of Henderson before that meeting. The jury was warranted in disbelieving the testimony of these two witnesses. And even if true, this testimony would not materially affect the jury's major duty, to ascertain whether Pitts murdered Henderson or acted in self-defense, at the time when the shooting occurred.

### Sole Eyewitness Rule of Weathersby Case

Appellant says that he was the only eyewitness to the shooting and his testimony as to how the killing occurred is credible and believable and is not contradicted by material, physical facts or by facts of common knowledge, and hence it must be accepted as true under the doctrine of Weathersby v. State, 1933, 165 Miss. 207, 147 So. 481. This being true, appellant argues he shot the deceased in justifiable self-defense, and therefore, the trial court should have given a peremptory instruction for appellant.

The Weathersby rule has long been established in our jurisprudence and is a salutary and logical recognition of the fact that a verdict must be based upon either direct or circumstantial evidence. That doctrine, however, is limited in scope to situations where the eyewitness version is not contradicted by material physical facts or by facts of common knowledge or by testimony of credible witnesses on substantial matters and not mere details. The present case is clearly within the contingencies which remove the necessity for the jury accepting the defendant's version. What took place at the scene of the homicide was known to no persons except appellant and deceased, but there are numerous material facts and circumstances bearing on appellant's

guilt vel non which would justify the jury in disbelieving appellant's testimony when it differed from these facts and circumstances. Appellant, over a period of several months prior to the shooting, was extremely resentful of deceased and his wife and their discipline and restrictions on the activities of their daughter. Appellant evidenced this resentment by constantly harassing and nagging them by telephone and personal calls, by saying that he didn't let anybody push him around, and by warning them "with a pop-gun". Appellant admitted his resentment at these restrictions. He particularly resented deceased sending his daughter, Anna, away from the state shortly after school was out, and appellant admitted that he threatened deceased with a public accusation to the authorities that he had sent his daughter out of the state for the purpose of having an abortion. This threat admittedly took place in Henderson's office on the morning prior to the shooting. Appellant had also previously told Henderson that he had gotten Anna pregnant. The jury was justified in accepting these circumstances as true and in disbelieving appellant's testimony that after such a morning's conversation with Henderson, Henderson invited appellant out to his house to get Anna's address. It could well have thought that an invitation after that conversation was not credible or believable.

Appellant admits that he armed himself with a loaded revolver and went to the home of deceased, and that he knew deceased was living alone, with his family out of the state. The jury could have believed that the back screen door was latched and that appellant punched the screen in some way to raise the latch and enter. Whether he did or not is not too significant, because at any rate he entered the home without any invitation to do so, the jury must have thought, and slept in the den until about 11-11:30 P.M. Appellant then took the only gun belonging to Henderson which appellant knew was in

the house and carried it to the attic with him. He closed the attic door and had turned out all of the lights in the house. He tore the telephone wire from the wall, and it was an issue of fact as to whether this was done accidentally or intentionally. There is ample evidence to support an inference by the jury that appellant intentionally disconnected the telephone in order to cut Henderson off from communication with the police and neighbors. Pitts having taken the only gun in the house, disconnected the telephone, turned the lights out, and hidden in the attic with his loaded pistol, the jury was amply justified in believing that all of these factors, together with the earlier events discussed above, showed a felonious intent to waylay, entrap, and murder Henderson in his own home when Henderson was there alone. Appellant told Officer Currie that he had gone to Henderson's home to "have it out with him."

Henderson's apparent fright and calling of the police when he thought Pitts might be or might have been in the house substantiates the inference that Henderson had no desire to injure Pitts. Pitts' statement to Detective Shipp that he started to open the trap door once and that Henderson told him to get back and stay back, and that Pitts then hollered that he was coming out, raised the ladder, pushed the door, and then two shots were fired almost together, tends to substantiate that part of the state's version of the shooting, that Pitts was using the trap door and ladder as a protection prior to shooting Henderson. Moreover, from photographs in evidence, it is apparent that the jury could have found that Pitts, while in the attic, was in no imminent danger of death or great bodily harm, unless Pitts exposed himself, that he could easily have stepped to one side of the attic opening and avoided Henderson, and that since the ladder was no more than halfway down, Henderson had no way to get into the attic to harm Pitts, assuming that Henderson wanted to do that. This point is developed

further in the next part of this opinion. The fact that Henderson was shot in the middle of the left eyebrow tends to negative appellant's testimony that he was holding the pistol loosely and not shooting directly at Henderson, but only intending to scare him. After the shooting, appellant picked up his pistol and fled from the house as fast as he could go.

These and other material physical facts and circumstances more than suffice to take this case out of the first part of the Weathersby rule. As was said in Grady v. State, 1926, 144 Miss. 778, 110 So. 225, 226, "the jury were justified in disbelieving appellant's testimony wherein it differed from the other facts and circumstances proven." The jury was not confined to appellant's evidence as to the manner in which the homicide took place. They had the right to consider also the facts and circumstances taking place prior to the homicide and subsequent to it. The court has repeatedly followed this interpretation of the Weathersby case, and properly permitted the jury to consider all material facts and circumstances bearing upon the homicide. McGehee v. State, 1925, 138 Miss. 822, 104 So. 150; Webster v. State, 1943, 194 Miss. 381, 12 So. (2d) 533; Herrin v. State, 1947, 201 Miss. 595, 29 So. (2d) 452; Goff v. State, Miss., 1950, 49 So. (2d) 238; Seals v. State, 1950, 208 Miss. 236, 44 So. (2d) 61; Hatcher v. State, Miss., 1951, 50 So. (2d) 387; 41 C. J. S., Homicide, Sec. 326, p. 54. The trial court was correct in refusing the peremptory instruction for appellant and in submitting the facts to the jury for their determination.

### State's Instruction on Self-Defense

Appellant also complains about the following instruction: "The Court instructs the jury for the State that the defendant could not arm himself with a deadly weapon, with the intention of using it to overcome the deceased if necessary, by either murdering him or inflicting grave bodily harm and injury upon him, and so armed, without

abandoning said purpose and so remaining the aggressor throughout the entire time, go upon the premises of the deceased and provoke a fatal difficulty with him and in such difficulty slay the deceased with such deadly weapon, and be heard to say that he acted in self-defense."

Appellant says that there was no evidence to support a finding that the appellant armed himself for the difficulty with the intention of seeking out the deceased for the purpose of provoking a conflict and that there is no evidence to support a finding that appellant was the aggressor. The above discussion indicates why our view is to the contrary. Moreover, a view of the attic, disclosed by photographs, shows that Pitts, while in the attic, could easily have moved to one side of the small opening into the attic from the hall and then he would not have been in danger from Henderson. Only by exposing himself at the opening was he in danger of being shot. The jury could have found that Henderson could not have ascended the ladder, because, according to Pitts' own testimony, it was only about halfway to the floor and was stuck at that point. In addition, Pitts knew that the police officers had been called and were on their way to the house. Also relevant on the question of whether appellant was in imminent danger is the fact that Henderson's bullet which hit in the casement of the attic door missed Pitts by at least several feet.

 Although flight to avoid danger from an aggressor is not necessary, McCall v. State, Miss., 1901, 29 So. 1003, Miss. Code of 1942, Sec. 2218(f) requires that in order for a homicide to be justifiable "there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." The jury could properly have found that Pitts was not in "imminent danger" when he voluntarily exposed himself to Henderson by standing next to the attic open-

ing rather than remaining in the attic and away from the opening. The right to kill in self-defense is founded on necessity, real or apparent. 26 Am. Jur., Homicide, Sec. 137. In order to justify or excuse the taking of human life in self-defense, "the danger of peril of loss of life or the infliction of serious bodily harm must be, or appear to be, impending and imminent . . . so urgent and pressing that it is necessary for him to kill in order to save himself . . ." 40 C. J. S., Homicide, Sec. 123, p. 1000. In view of these physical, surrounding circumstances, the jury was justified in finding that Pitts was in no imminent danger of losing his life or suffering great bodily harm at the hands of Henderson.

Appellant further says that this instruction is too abstract and gives the jury no certain guide as to the elements which must be proved to cut off appellant from the right of defending himself. However, a careful reading of the instruction reflects that it adequately deals with the necessary elements in accordance with earlier decisions. Instruction No. 11 given defendant is not in conflict with the above instruction, because No. 11 deals with a different situation, on the assumptions that there was a reasonable doubt that appellant provoked the difficulty and that deceased was the aggressor. The quoted instruction proceeds upon the premises that appellant provoked the difficulty and was the aggressor. Nor is there any conflict with Instruction No. 12 given defendant, because that instruction sets forth the rule of the Weathersby case, and the jury found that the facts and circumstances made the first part of that doctrine inapplicable, the second applicable.

Nor does the quoted instruction estop appellant from pleading self-defense. It tells the jury in effect that if it finds the stated facts to exist from the evidence, it could find that appellant did not act in self-defense. Moreover, appellant obtained six instructions setting out in detail all aspects of his plea of self-defense, and that

issue was adequately submitted to the jury for its decision. Durham v. State, 1930, 158 Miss. 833, 131 So. 422; Stubblefield v. State, 1926, 142 Miss. 787, 177 So. 663; Woods v. State, 1938, 183 Miss. 138, 183 So. 508; see also Hunt v. State, 1894, 72 Miss. 413, 16 So. 753; Cotton v. State, 1924, 135 Miss. 792, 100 So. 383.

Certain Closing Arguments of District Attorney

It is also urged that the district attorney's closing arguments to the jury in certain assigned respects were so abusive, unsupported by evidence, and prejudicial as to constitute reversible error. This assignment was evidenced by a special bill of exceptions in the record, setting forth ten statements made by the district attorney, nine of which are argued in the brief of appellant. The first of those statements was cured by the correction of it by the district attorney himself. The second and third were proper and based either upon evidence in the record or permissible inferences from it. Moreover, objections to the first and third were sustained by the trial judge, and as to the second, the court instructed the jury to be guided by the evidence only. Appellant objected to the fourth and fifth statements, but concedes the fourth to be proper, and obtained no ruling by the trial judge on either of those objections, and, therefore, can not complain of them.

We have considered carefully the remaining five statements in the bill of exceptions, and are of the opinion that, although they were improper, they cannot cause a reversal. ■■ ■■ After each of the statements, the court sustained objections to it. The cumulative effect on a jury of the trial judge's sustaining a defendant's objection to argument and often admonishing the state's attorney to stay within the evidence usually has the effect of curing the improper conduct and prejudicing the state's rather than the defendant's case. Thomas v. State, 1946, 200 Miss. 220, 26 So. (2d) 469; Moon v. State,

1936, 176 Miss. 72, 168 So. 476. And as was said in Bufkin v. State, 1923, 134 Miss. 116, 98 So. 455, 457, ''if the judge promptly instructs the jury to disregard such comment we will assume that the jury obeyed the judge's instruction and did not regard it, unless it affirmatively appears from the record to the contrary, or unless the statement is of such extreme prejudicial nature as to convince the court that it probably affected the result.'' Cavanah v. State, 1879, 56 Miss. 299. The test in each case is necessarily dependent upon the particular circumstances of that case.

Moreover, this case aroused considerable publicity, indignation, and emotions on both sides, and no doubt the eloquent arguments of able counsel for appellant contributed somewhat to the vigor and enthusiasm of the district attorney's argument. As was said in Blackwell v. State, 1931, 161 Miss. 487, 497, 135 So. 192, 194, 137 So. 189, ''it is difficult . . . to tell . . . its relation to the argument of the attorney for the appellant in the trial.'' In Nelms & Blum Company v. Fink, 1930, 159 Miss. 372, 381, 131 So. 817, 820, the Court commented: ''It is always a difficult matter, as well as a delicate one, to determine whether there has been an abuse of the privilege of advocacy in the argument of the causes, except in a few cases where it is so palpably evident that the case has been prejudiced by a statement of facts not in evidence or by gross invectives and abuse, and we do not have the advantage that the trial judge has of hearing the argument as a whole. The trial judge has a peculiar and distinct advantage of the judges of this court in judging upon such questions, because he is not only familiar with the evidence and the atmosphere of the case, as it may be called, but he has heard the entire argument and knows the setting that the language complained of has in connection with the argument on both sides of a case.''

Nor do the arguments objected to fall within any of the classes for which reversal is often had, such as

comment on the failure of defendant to testify, Gibbs v. State, 1933, 167 Miss. 598, 149 So. 796, abusive language aimed at the defendant, Hampton v. State, 1906, 88 Miss. 257, 40 So. 545, or an appeal to racial prejudice, Harris v. State, Miss. 1950, 46 So. (2d) 91.

The propriety of the argument is to be adjudged in the light of several factors peculiar to this case. Among these are, first, the rather astonishing range which the testimony took, encompassing prolonged details which were as irrelevant as they were salacious. Secondly, one of the assignments of error directed to parts of the argument is based upon the asserted fact of the presence in the gallery of the courtroom of a great number of high school students who, for some reason, or without reason, were absent during school hours from the high school in which appellant had been a student. If the implication of their presence was not well-founded, the alleged remarks of the district attorney were meaningless and without prejudice. If these students were truant or present with permission, it is possible that Section 26 of Mississippi Constitution of 1890 may not have been available to clear the courtroom of mere curiosity seekers in this type of case. At any rate, this circumstance may be deemed a regrettable incident of a public trial. However, our function is merely to adjudicate the fact of prejudice vel non, and from the intimations brought into the record by defendant, we cannot find that the presence of these students, if such was a fact, and a reference to a fact obvious to the jury without need of any directed attention, was prejudicial to the appellant.

The trial court was scrupulously fair and insistent upon a full presentation of defendant's case. We must assume, as the court said in Gray v. State, 1907, 90 Miss. 235, 242, 43 So. 289, 290, that the jurymen are "men having and exercising average intelligence and average integrity, capable mentally of understanding the written instructions of the court and the argument of counsel, and capable morally of having the courage and firm-

ness to draw their own conclusions for themselves from the law as written and from the testimony as delivered, without reference to improper appeals from counsel on either side. The administration of justice is a pre-eminently practical thing.''

The basic conclusion to be drawn from the many decisions in the history of this court concerning argument of counsel is that counsel has an extremely liberal latitude in arguing a controversy, and that this court's responsibility is to weigh the arguments assigned as error in the scale with the entire context of the case. · We have done that here and do not think that the arguments complained of affected the result in the trial court.

Appellant had a fair and full trial in the circuit court, and was ably represented both there and here. His guilt or innocence was a question for the jury, and we find no errors of law which would justify setting aside that verdict.

Affirmed.

PER CURIAM.

The above opinion is adopted as the opinion of the Court, and for the reasons therein indicated, the judgment of the circuit court is affirmed.