# HATCHER *v.* STATE

No. 40383 February 18, 1957 92 So. 2d 552

*Russell Wright*, Meridian, for appellant.

*John H. Price, Jr., Asst. Atty. Gen.*, Jackson, for appellee.

ROBERDS, P. J.

About eleven o'clock on the morning of June 7, 1955, a collision occurred between a Cadillac automobile and a bicycle on U. S. Highway 45 about four and a half miles north of Meridian, Mississippi. Hatcher, the appellant, was the driver of the automobile. He was the only person in the car. Bobby Green, a small boy, was the rider of the bicycle. Bobby was killed intantly. Hatcher was indicted for, and convicted of, manslaughter under the culpable negligence statute. Section 2232, Miss. Code 1942, and sentenced to the state penitentiary for seven years.

He appealed to this Court. He contends: (1) that he was entitled to a peremptory instruction, or, if not, (2) the verdict was against the great weight of the evidence and we should remand the case for trial before another jury, and (3) that, in any event, we should reverse and remand the case because of improper remarks made by the district attorney in his closing argument to the jury. We will consider the first two contentions together. The State introduced seven witnesses. Hatcher and one other witness testified in his behalf. The evidence of the State established these facts: U. S. Highway 45 is a paved highway, it extends generally north and south. At the point of the accident, and for some distance north and south thereof, it is straight and level, and vehicles thereon may be seen a long distance both north and south of the scene of the collision. Just off the road right-of-way and on the west side thereof, and a

short distance south of the point of collision, were located a gasoline filling station and a cafe. These buildings faced east upon the highway.

Hatcher was traveling north. Before reaching the cafe and gas station he passed a truck also traveling north. He was running seventy-five to ninety miles per hour. As he approached the cafe he began to blow his horn and continuously looked towards the cafe and station as if to attract the attention of someone. He continued north, running at the same rate of speed. Bobby Green was riding north on his bicycle, within about two feet of the east edge of the pavement. Hatcher's automobile struck the bicycle at this point. It had not slowed down. The child's body was hurled into the air. It turned over a number of times in the air above the top of the car. The automobile ran from under the body. The body came to rest on the concrete 150 feet north of the point of impact. The child's head was severed from the body and it fell on the concrete several feet from the remainder of the body. A hole was knocked through the right side of the windshield of the automobile and there were some marks on the right side of the car made apparently as a result of contact between the automobile and the bicycle. There were no skidmarks south of the point of impact. The first skidmarks began five feet north of the point of impact. From that point the car skidded on all four wheels 90 feet, and thence on the left tires 240 feet, making a total in all of 330 feet the automobile skidded after hitting the bicycle and the little boy. Eye-witnesses testified that Bobby did not turn or swerve to the left. They swore he was continuing straight ahead. The Cadillac car hit the bicycle at a point two feet from the right, or east, edge of the pavement. No vehicle was approaching from any direction. The truck Hatcher had passed south of the cafe pulled into the gasoline station. There was nothing on the highway to obstruct or interfere with clear vision north

and south, and no reason appears why Hatcher could not have pulled to his left and passed the bicycle.

Hatcher testified. He said he was traveling some sixty miles per hour. He admitted he was constantly blowing his horn as he passed the cafe and gas station and looking in that direction. He said: "I probably glanced over that way to see if anything was pulling out or anything, but I did not stare over there." He admitted he saw the little boy traveling north in the same lane 100 yards ahead of him, and that he was near the east edge of the pavement. He said he began to put on his brakes about thirty feet before he hit the child. His theory of how the accident happened is that Bobby swerved to the left into the Cadillac. However, he was indefinite about that. When asked whether the car struck the bicycle or the bicycle struck the car, he replied: "I think he run into the side of the car."

The other witness for Hatcher was J. V. Duckworth. He was Sheriff of Lauderdale County. It was his automobile Hatcher was driving. He had left it with Hatcher, who operated an automobile repair shop, to regulate the carburetor and adjust the doors. He said when the carburetor got hot the motor would cut out when running between sixty-five and seventy miles per hour. He did not know whether the engine was hot on this occasion, nor did he know whether the engine would run smoothly again when "you got up to 80 or 90."

██ █ This Court has laid down the rule by which liability is to be tested in culpable negligence cases. It did that in Smith v. State, 197 Miss. 802, 20 So. 2d 701, rightfully regarded as one of the leading cases in the United States on the question. After a learned and thorough discussion of the question, the Court summed up the test in this language: "In other words, the gist of the offense of involuntary manslaughter with a motor vehicle is criminal negligence, which must be wanton or reckless under circumstances implying danger to human

life." The tests applied in the Smith case have been adopted and restated in subsequent cases. Reynolds v. State, 199 Miss. 409, 24 So. 2d 781; Henderson v. State, 199 Miss. 629, 25 So. 2d 133; Downs v. State, 206 Miss. 831, 41 So. 2d 19; Coleman v. State, 208 Miss. 612, 45 So. 2d 240; Sullivan v. State, 213 Miss. 14, 56 So. 2d 93; Hynum v. State, 222 Miss. 817, 77 So. 2d 313; Hathorn v. State, 225 Miss. 77, 82 So. 2d 653. █ Now, applying the rule to the facts of this case, it is clear Hatcher was guilty of culpable negligence, at least the jury was amply justified in so finding. The all-important fact is the impact took place within two feet of the right edge of the pavement. Hatcher admits that he saw the child 100 yards ahead of him. He made no effort to turn his car to the left and pass the child, although no vehicle was approaching from the north in the west lane of travel. His theory is the child either turned in ahead of him or swerved to the left into the side of the automobile. Evidently he hit the child head-on, because the undisputed proof is the body of the child was hurled several feet into the air above the automobile and came to rest on the pavement 150 feet north of the point of impact. Had the bicycle run into the right side of the automobile, naturally the child would have been thrown to the east and perhaps entirely off the pavement. However, in either case Hatcher was guilty of culpable negligence in hitting the child under the circumstances, certainly the jury was amply justified in so finding. Brooks v. State, 192 Miss. 121, 4 So. 2d 886; Henderson v. State, supra; Cutshall v. State, 203 Miss. 553, 35 So. 2d 318; Hynum v. State, supra; Dendy v. State, 224 Miss. 208, 79 So. 2d 827.

 █ In his closing argument, the district attorney said: "You see these good Lauderdale County people sitting out in this audience, they are wondering whether this sort of thing is going to be licensed." Counsel for defendant objected to this remark and the objection was

overruled. The statement should not have been made and the trial court should have sustained the objection. However, the question is whether the remarks require a reversal and remand and retrial of this case. It has given us much concern but we have concluded that, under the circumstances of this case, the use of this language does not call for a reversal and remand.

Able counsel for Hatcher cites and relies upon Collins v. State, 100 Miss. 435, 56 So. 527. In that case a member of the Negro race was being tried for the killing of a member of his own race. The prosecuting attorney said: "This bad nigger killed a good nigger. The dead nigger was a white man's nigger, and these bad niggers like to kill that kind. The only way you can break up this pistol toting among these niggers is to have a necktie party." Counsel for defendant stated in his argument that a witness for the State had assisted in hiring a special prosecutor and was taking an interest in the case. The prosecuting attorney answered that by saying to the jury: "I will tell you who employed me to prosecute this nigger. It was the people of the community, white and black." Naturally this Court held that the use of this language constituted reversible error. The Court in that case said: "The ordinary, average juror is very easily influenced by a statement to the effect that the people of the community, both white and black, employ one to prosecute. The very fact that this is done is the highest evidence that the community desires the party convicted." In addition, this was, to some extent, an appeal to racial prejudice. The facts in the Collins case, however, it is readily seen, are quite different from the facts in the case under consideration.

In Nelms & Blum Company v. Fink, 159 Miss. 372, 131 So. 817, this Court, speaking through a classical opinion by Judge George Ethridge, worthy, we think, of repetition, said:

"It is always a difficult matter, as well as a delicate one, to determine whether there has been an abuse of the privilege of advocacy in the argument of the causes, except in few cases where it is so palpably evident that the case has been prejudiced by a statement of facts not in evidence or by gross invectives and abuse, and we do not have the advantage that the trial judge has of hearing the argument as a whole. The trial judge has a peculiar and distinct advantage of the judges of this court in judging upon such questions, because he is not only familiar with the evidence and the atmosphere of the case, as it may be called, but he has heard the entire argument and knows the setting that the language complained of has in connection with the argument on both sides of a case. Very often by a course of argument counsel on one side of an argument provoke a course of argument which would not be made without being provoked, and it is, of course, easy for the trial judge to see whether this is true or not. He has a duty to perform to see that there is no such abuse of the parties in argument as would make injustice prevail in the case. It is a difficult and a delicate duty for even the trial judge to under take to interfere with the argument until it has clearly and conclusively exceeded the legitimate field of argument. Counsel necessarily has and must have to serve his function and office, a wide field of discretion. He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as eloquently pointed out by Chief Justice Whitfield in Gray v. State, 90 Miss. 235, 43. So. 289, Counsel is not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever way he deems proper, so long as he

does not become abusive and go outside the confines of the record. Usually when the argument is considered as a whole it is found consistent and logical and frequently eloquent. Some of the greatest speeches in our history have been made within the courthouse. As has been said, the court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence.

"Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument. He may clothe the common occurrences of life in the habiliments of poetry and give to airy nothings a habitation and a name. He may weave of words a rhetorical bouquet that enchants the ear and mesmerizes the mind. He may make the learning of the ages the servant of his tongue. His argument may be as profound as logic and learning can make them. He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence. As to the facts in evidence, he may array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his

mind for the best interest of his cause. He cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.''

Looking now to the nature of the statement made by the district attorney, it is noted that what he said was, and had to be, an expression of his opinions, except the fact that people were in the audience. The jurors knew that fact as well as did the district attorney. His statement that they were good people of Lauderdale County and that they were wondering what the verdict would be were his opinions. The jurors, taken from the entire county, knew as well, or perhaps better, than the district attorney whether those in the audience were "good Lauderdale County people." The statement about which the audience was wondering, "if this sort of thing is going to be licensed", in other words, what the verdict was going to be, was no doubt a correct assumption on the part of the district attorney, but the staement was nothing more than the expression of an opinion. The jurors knew that and, no doubt, themselves had varying opinions as to what the audience thought or expected.

In Pitts v. State, 211 Miss. 268, 51 So. 2d 448, the district attorney made reference to the large number of high school children who were in the gallery of the courtroom. This Court found that not to be error. Also, in that case the Court observed: "Nor do the arguments objected to fall within any of the classes for which reversal is often had, such as comment on the failure of defendant to testify, Gibbs v. State, 1933, 167 Miss. 598, 149 So. 796, abusive language aimed at the defendant, Hampton v. State, 1906, 88 Miss. 257, 40 So. 545, or an appeal to prejudice, Harris v. State, 1950, 46 So. 2d 91." That language is applicable to the facts of this case.

It is difficult to see how the defendant was materially prejudiced by the remarks of the district attorney in the case at bar.

However, aside from what has been said above, we do not think the remarks of the district attorney should work a reversal of this case for the reason that Hatcher was guilty of culpable negligence under his own testimony. ██ ██ Rule 11 of the rules which have been adopted by this Court (215 Miss. 601) provides: "No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice." Hatcher said he was traveling sixty miles an hour. He saw Bobby Green on his bicycle traveling on the east side (his side) of the paved highway, the same direction Hatcher was traveling. He was overtaking the child. He made no effort to go to the left and pass Bobby, although no vehicle was approaching on that side, and he could see the road for a long distance ahead. According to his own statement, he made no effort to slow his speed until he got to within thirty feet of the little boy although it is undisputed that the first skidmarks began five feet north of the point of impact. He does not deny that he struck the child about two feet west of the east curb of the pavement, showing conclusively that he made no effort to pass the bicycle by pulling to the left. It was the most culpable kind of negligence for him to approach the child from the rear at a speed of sixty miles an hour, traveling within two feet of the east edge of the pavement directly behind the child, even though the child did swerve to the left as Hatcher says. As a reasonable man he ought to have known what might happen. The greater the danger, the greater the degree of care required. Smith v. State, supra. Had the rider of the bicycle been an adult, a person

of mature judgment, the duty on Hatcher might not have been so great. One wonders what he thought the child was going to do, turn to the east entirely off of the pavement or cut across the highway to the left lane to escape being run over by the automobile? We think Hatcher's own testimony brings him within Rule 11. We cannot say the judgment here was a miscarriage of justice.

Affirmed.

*Hall, Lee. Holmes* and *Ethridge,* JJ., concur.