HENRY *v.* COLLINS

No. 42759 December 2, 1963 158 So. 2d 28

*Jack H. Young, Carsie A. Hall,* Jackson, *Robert L. Carter, Barbara A. Morris, Marie L. Marcus,* New York, N. Y., for appellant.

*Semmes Luckett, Leon Porter, C. L. Sullivan,* Clarks-
dale, for appellee.

40

Lee, P. J.

This is a libel action, instituted by Benford C. Collins against Aaron E. Henry in the Circuit Court of Coahoma County, to recover damages on account of the publication of a false and defamatory charge against the plaintiff. There was a verdict for the plaintiff in the sum of $15,000, and the defendant has appealed.

The declaration charged that the defendant, on the 6th day of March 1962 maliciously prepared, composed and published a libelous writing to Mr. Norwood, Deputy Sheriff of Bolivar County, which contained a malicious libel against the plaintiff. It was also charged that the defendant, in like manner, made such charges to the United Press International News Bureau and the Associated Press News Bureau with express intent for these agencies to publish, republish, communicate and circulate the statements among their subscribers throughout the State of Mississippi and the other states of the United States. Copies of the alleged false statements were attached to the declaration as exhibits. It was also alleged that these statements attribued to the plaintiff a gross violation of the law and his duties, and caused injury to him in his personal, social, official, business and professional life, thereby exposing him to public hatred, contempt and ridicule, with great damage to his reputation and good standing in the community.

The answer of the defendant admitted that he wrote the letter in question but that it was not maliciously prepared; and denied that the letter was false, defamatory and libelous. He likewise denied that he maliciously prepared and caused to be published the alleged communications to the press organizations and their subscribers; and denied that the plaintiff was injured in any way by reason of the publication.

Manuel Nasser, a Deputy Sheriff of Bolivar County and Deputy Marshal of the Town of Shelby, and Charlie Reynolds, a police officer of Clarksdale, on March 3, 1962, upon returning to the city hall in Shelby, after their efforts to locate a witness in a lawsuit, were accosted by Sterling Lee Eilert, who appeared to be scared, shaking and pale. He complained about an incident which had occurred in a black Star Chief Pontiac automobile, with a tag number ending in 1769, as he was hitchhiking from Memphis, Tennessee. These officers, in an effort to identify the automobile, called the Clarksdale Police Department, and were advised that Aaron Henry was the owner of a 1961 Pontiac automobile bearing License Tag No. C 14 - 1769. Eilert thereupon made an affidavit before V. E. Rose, a Justice of the Peace, charging Henry with disorderly conduct. The Justice of the Peace issued a warrant for the arrest of Henry on that charge and delivered it to Reynolds for transmission to the authorities in Clarksdale. When the warrant was received at Clarksdale, the plaintiff, the Chief of Police, went to the defendant's home and advised him that he was under arrest on a charge of disorderly conduct and gave him a copy of the warrant. When Collins delivered his prisoner to the city jail, Mayor W. S. Kincade, who was at the police station, talked to Eilert, and directed Collins to call the County Attorney, Pearson, to come to the city hall for the purpose of an interrogation. With great reluctance, because he was preparing to go to a social activity, the county attorney went to the city hall and talked to the parties in order to ascertain where the alleged crime had actually occurred. To that end, he took tape recordings of the statements of Eilert, Clifford Smith, Noelle Henry, wife of the appellant, and appellant himself. When he had concluded the interrogation, the county attorney was of the opinion that no criminal offense had been committed in Coahoma County. The appellant was then turned over to Bolivar County officials.

On March 6, two days after his release, appellant wrote the letter complained about to Deputy Sheriff Norwood. Because of its length, the same is not set out verbatim. However, it advised the officer that he had filed a complaint with the Department of Justice, charging a denial of civil rights because of his arrest. Henry stated that the arrest "was born in the minds of the county attorney and the chief of police due to his activity" in certain areas. The letter told the officer that "I am not charging nor am I of the opinion that you nor any other authority of Bolivar County is a party to this diabolical plot. I do think that the two men above-mentioned (the county attorney and the chief of police) have schemed with some person to make the charge in Bolivar County", etc.

The statements which the defendant made to United Press International and the Associated Press, on the same date as the latter, were prepared by the appellant and read over the telephone to the representatives of the two press agencies. In each instance, defendant referred to his arrest on the charge of making immoral advances toward a male person in a claim that this was an attempt to discredit him. He called the arrest "a diabolical plot cooked up" by Coahoma County Attorney Pearson and Clarksdale Police Officer Ben Collins. The representatives of the press agencies, in each instance testified that the appellant expressed the desire to read the statement to them, that he did so, and that they were particularly careful to write down his exact language. These statements were forwarded to subscribers and were published in the Clarksdale Press Register, the Biloxi-Gulfport Daily Herald, the Daily Corinthian, the Delta Democrat Times, and the Vicksburg Evening Post.

The appellant, forty years of age and a pharmacist, admitted that he wrote the letter to Mr. Norwood. He knew that the press agencies gathered and carried news

items over the country, as he had previously given items to them. He admitted that he used the two words "diabolical plot" in his letter. But, in an effort to explain his use of the words in the letter and statement, he said that they constituted his opinion of what the acts amounted to, and they were not uttered as a result of malice. He admitted that he had experienced several other clashes with the law. His witnesses said that they believed that the appellant would tell the truth, but they did not think the publications resulted in any harm to the appellee.

The evidence showed that neither Nasser nor Pearson had ever seen Eilert Prior to the time that he approached them in Shelby, and, succesively, in the city hall at Clarksdale. Collins knew nothing of the events in Shelby until the message was received over the radio that a warrant had been issued for appellant's arrest. The evidence showed positively that no one had framed the defendant or "cooked up" any plot, diabolical or otherwise, to have him arrested on a morals charge. There was no contact between Collins and Pearson until Mayor Kincade directed Collins to call Pearson and tell him to come to the city hall.

The appellant assigns a number of alleged errors as grounds for a reversal, and these will be taken up and disposed of in the order in which they may be listed.

On the question of whether or not the appellant was entitled to a peremptory instruction at the close of the case, a proper evaluation of the evidence is as follows:

Some of the meanings of the expression "cook up", from their common acceptation, are "to make up: devise or fabricate often factitiously as an expedient: prepare, concoct, improvise — usu. used with up * * *" and "to alter to convey an untrue impression: falsify, doctor, angle, manipulate." Webster's 3rd New International Dictionary, Unabridged.

"Diabolical", in like manner, may mean "Of or relating to the devil or devils: being under the influence

of devils: resembling a devil: devilish, fiendish." Webster's 3rd New International Dictionary, Unabridged.

"Plot", in like manner, may mean "conspiracy, intrigue." Webster's 3rd New International Dictionary, Unabridged.

Thus, if human testimony is to be believed, there was no semblance of justification or excuse for the utterance and publication of these statements. It is evident that the purpose was to create a defense of the charge for which he was arrested and to do this by charging the appellee and the other officer with "cooking up a diabolical plot" against him, meaning thereby that these officers were perjurers and had suborned others to perjure themselves. In other words, by this libel, these officers were charged with the commission of a leathsome and reprehensible crime, a crime so revolting as to produce hatred, contempt and ridicule, and to destroy credibility and degrade and lessen confidence and respect for them in the community. Such statements could spring only from wilfulness and malice or an utter disregard of all moral and ethical actions of human conduct. These statements were therefore libelous per se.

In Conroy v. Breland, et al., 185 Miss. 787, 189 So. 814, the opinion said: "At common law any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se. Hodges v. Cunningham, 160 Miss. 576, 581, 135 So. 215; Wrought Iron Range Company v. Boltz, 123 Miss. 550, 558, 86 So. 354; and no special damages are necessary to be alleged or shown in order to prevail against a demurrer, or a motion to exclude. 3 Rest., Torts, Sec. 569. The statement of the rule, as set forth in this paragraph, must not be confused with that more precisely applicable to slander or oral defamations, and must, of course, be taken in connection

with the further rule, prevailing in this State, that the truth of the matter alleged to be defamatory, whether in slander or in libel, is a good defense. Neely v. Payne, 126 Miss. 854, 89 So. 669; 36 C. J., pp. 1231, 1232, and cases there cited.''

The Hodges and Boltz cases, cited in the above quotation, as well as Hines v. Shumaker, 97 Miss. 669, 52 So. 705, fully document the above statement. In Hines v. Shumaker, supra, the Court said:

''Appellant sought by their pleadings and proof to qualify the language of the letter, by pleading and endeavoring to prove that the letter did not charge, and was not intended to charge, generally, dishonesty to the plaintiff. But the question for the court to determine is, not what language the appellants meant to use, but what did they mean by the language actually employed?'' See also Great A. & P. Tea Company v. Majure, 176 Miss. 356, 167 So. 637; and Natchez Times Pub. Company v. Dunigan, 221 Miss. 320, 72 So. 2d 681, the latter also pointing out that, the article being libelous per se, malicious intent is not even necessary to sustain the action, citing Jarnigan v. Fleming, 43 Miss. 710; Rodgers v. Kline, 56 Miss. 808; Upton v. Times Pub. Company, 104 La. 141, 28 So. 970.

 █ If actionable per se, general damages need not be pled or proved, but are presumed to result. Travis v. Hunt, 224 Miss. 193, 79 So. 2d 734; Natchez Times Pub. Company v. Dunigan, supra; and the cases with which those opinions are documented.

 █ But malice was actually established in this case. See Kroger Gro. & Bak. Company v. Harpole, 175 Miss. 227, 166 So. 335, where it was said: ''Malice in fact relates to the state or condition of the mind of a person who speaks defamatory words. It includes an intention to injure, hatred, or ill will, but is not limited thereto, and appears if words of the character here under consideration were spoken wantonly and

in disregard of a civil obligation, i.e., if they were spoken recklessly without knowing or caring whether they were true. This is in accord with practically all of the authorities." See also Reliance Mfg. Company v. Graham, 181 Miss. 549, 179 So. 341.

██ ██ Under the evidence, there was clearly such publication in the newspapers and by letter as to fasten liability upon the appellant. See 53 C.J.S., Libel and Slander, Sec. 85, p. 137, where it says in part: "The author of the defamation is liable for any secondary publication which is the natural consequence of his act; and this rule applies both to libel and slander." See also 33 Am. Jur., Libel and Slander, Sec. 197, p. 185, of the like effect; Newell, Libel and Slander, 4th Ed., p. 339. Manifestly, the case, on the merits, was properly submitted to the jury, and the requested peremptory instruction was properly refused.

## ON OBJECTION TO DICTIONARY DEFINITION OF WORDS

In the course of the appellant's cross-examination, he was asked to read a dictionary definition of "diabolic" and "plot". The objection was that the meaning in question was what the witness, not what someone else, understood it to be. The witness read from the book the definition of "diabolic" and confirmed also the meaning of "plot" therein, saying in each instance that those were definitions. He was asked if he wished to pick out others, but he declined to do so; nor did he offer his own accepted definition for those words.

This Court has recognized that, under the Anti-Dueling Statute, Sec. 1059, Code of 1942, Rec., the words there contemplated are "from their usual construction and common acceptation * * * considered as insults, and calculated to lead to a breach of the peace * * *". Huckabee v. Nash, 182 Miss. 754, 183 So. 500, and Salvo v. Edens, 237 Miss. 734, 116 So. 2d 220.

██ ██ In cross examination, a wide latitude is allowed. The examiner, in this instance, was trying to ascertain the appellant's understanding of the words. The appellant, however, advanced nothing to the contrary. ██ ██ There is no complaint that the court used a dictionary definition in the instructions to the jury. Of course that cannot be done, Jarnigan.v. Fleming, supra, so held.

██ ██ It therefore follows that the objection to this examination was without merit.

## THE MOTION TO QUASH THE JURY PANEL

The appellant, on this motion, placed on the stand three supervisors and the chancery clerk of the county in an effort to show discrimination, because of race, in selecting, drawing and empaneling jurors. But these witnesses, with one accord, testified that there had been no discrimination whatever in the selection, drawing and empaneling of jurors as regards the white and Negro races; that they selected "qualified persons of good intelligence, sound judgment, and fair character" in strict conformity with Sec. 1766, Code of 1942, Rec.; and that there were no marks to indicate in any way the color of the potential jurors. Besides, six Negroes, registered and qualified persons, used as witnesses by the appellant, testified that they had been called for jury service several times in past years, and that others of like color were on the jury panels at those times. One witness testified that he remembered that eight or ten Negroes were called on the panel at one term last year. The trial judge stated into the record that he had been the presiding judge of that court since January 1943; that, to his knowledge, Negroes had not been systematically kept off of juries; and that the court had empaneled them on both grand and petit juries since he had been judge. He mentioned cases when Negroes actually sat on the panel in trials. He either drew the

name of the jurors, or they were drawn by the statutory officers, when he did not perform this service, and that there was no instance of failing to select, or of excluding, Negroes because of their race. There had always been quite a number of such names in the boxes.

■■ ■ In other words, the evidence wholly failed to show any discrimination against Negroes in the selection and empaneling of jurors. And so, as it was said in Wilson v. State, 243 Miss. 859, 140 So. 2d 275, at page 867:

"Appellant, therefore, did not meet his burden. His witnesses proved that the converse of his motion was true." See also Akins v. Texas, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692, and cases there cited, Cf. also Hernandez v. Texas, 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866; Kennard v. State, 242 Miss. 691, 128 So. 2d 572.

This Court in Cameron v. State, 233 Miss. 404, 102 So. 2d 355, observed that it was a matter of common knowledge that the supervisors, in most of the counties in the state, since the decision of the Supreme Court of the United States in the case of Patton v. Mississippi, 332 U. S. 463, 68 S. Ct. 184, 186, 92 L. Ed. 76, have been placing the names of qualified Negroes in the jury boxes. Cf. also Goldsby v. State, 240 Miss. 647, 123 So. 2d 429 (1960), cert. den., 365 U. S. 861, 81 S. Ct. 829, 5 L. Ed. 2d 824, where a change of venue was granted because of lack of names of Negroes in the jury boxes in the county where the crime was committed.

Manifestly the court correctly overruled the motion to quash the panel of jurors on account of the alleged discrimination against selection of Negroes for jury service.

## OVERRULING MOTION FOR MISTRIAL ON ACCOUNT OF ARGUMENT TO JURY BY COUNSEL FOR APPELLEE

The appellant contends that the court committed reversible error in its refusal to grant him a mistrial because of alleged prejudicial argument by counsel for appellee in the closing address to the jury. The record discloses the statements and the actions thereon as follows:

"SULLIVAN: 'If they put that white boy out on the highway, how in the world did they know that Aaron Henry was going to come by? I don't know. How in the world did they know a Pontiac was going to come down that highway being driven by Aaron Henry? Yet Aaron Henry himself said 'I picked him up on the highway.'

"(LOUD MURMUR IN COURTROOM.)

"SEMMES LUCKETT: Your Honor, I will ask that the courtroom be cleared.

"COURT: Mr. Sheriff, I am not going to have that kind of thing going on in this courtroom. Is there a motion to clear the courtroom?

"CHARLES SULLIVAN: No, sir, not as long as it doesn't reoccur.

"COURT: I want to announce that no person shall open their mouth again, regardless of who they are. This is the first time a thing like this has happened in the 23 years that I have been on the bench. Mr. Sheriff, stand out there and if a single person bats an eyelash I want them brought up here. Proceed with your argument, Mr. Sullivan.

(The record does not show that any objection whatever was made by counsel for appellant to the language which had been used or to what had occurred at that time.)

"SULLIVAN: 'Do you know what punitive damages are, and compensatory damages, for that matter? They are a by-product of our civilization. There was a period in man's history when if someone had said what Aaron Henry said about Ben Collins, there would have been a homicide that night — somebody would have gotten killed. There was a time in Mississippi when that would have happened. If Aaron Henry had accused this man of being a dirty crook, there was a time when there would have been a killing that night.

"JACK H. YOUNG: We object, your Honor.

"COURT: I sustain the objection.

"CHARLES L. SULLIVAN: I think that is a proper statement, your Honor.

"JACK H. YOUNG: I would like to make a motion, your Honor, for a mistrial.

"COURT: I overrule the motion for a mistrial, but let the record show that I am instructing the jury to disregard that statement. Continue with your argument."

The speaker then resumed his argument, and, from the context, it is clear that he was undertaking to explain the difference between punitive, and compensatory, damages. He asserted that punitive damages are a by-product of our civilization, saying that "There was a period in man's history when if someone had said what Aaron Henry said about Ben Collins, there would have been a homicide that night — somebody would have gotten killed. There was a time in Mississippi when that would have happened. If Aaron Henry had accused this man of being a dirty crook, there was a time when there would have been a killing that night." This reference was evidently to the pioneer days of the country when a man, who felt that his honor had been questioned, arrogated to himself the right to be his own avenger. Dueling was commonly practiced, not only in this state,

but in other parts of this country. A noteworthy instance is the well-known duel between Burr and Hamilton. In an effort to suppress this evil, the Legislature of the state enacted the so-called Dueling Statute, Sec. 1059, Code of 1942, Rec., making "All words which, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace * * * actionable." Huckabee v. Nash, 182 Miss. 754, 183 So. 500; Salvo v. Edens, 237 Miss. 734, 116 So. 2d 220; as heretofore stated.

 █ Since the first statement of counsel was not objected to at all during the trial and was first raised in appellant's brief in this Court, the objection is without merit. In Robertshaw Trustees v. Columbus & G. Ry. Co., 185 Miss. 717, 188 So. 308, it was said: "In order to put the trial court in error, it must be shown not only that there was error but that the error or errors were committed by the court after a fair and definitely presented opportunity was given to avoid or correct them." See also Stevenson v. Robinson, 37 So. 2d 568 (Miss.); Lyle v. Johnson, 240 Miss. 154, 126 So. 2d 266.

 █ The basis of the rule against argumentative appeals to racial prejudice, in its full extent, is stated in Hampton v. State, 88 Miss. 257, 40 So. 545, as follows: "Malattoes, negroes, Malays, whites, millionaires, paupers, princes, and kings, in the courts of Mississippi, are on precisely the same exactly equal footing. All must be tried on facts, and not on abuse. Only impartial trials can pass the Red Sea of this court without drowning. Trials are to vindicate innocence or ascertain guilt, and are not to be vehicles for denunciation." And in Harris v. State, 96 Miss. 379, 50 So. 626, it was said: "Every defendant at the bar of his country, white or black, must be accorded a fair trial according to the law of the land, and that law knows no color." In the first instance, the sale of liquor was charged. Objection to the prejudicial argument went unrebuked by the court,

and exceptions were properly taken. In the second instance, the defendant, a Negro, was being tried on the charge of assault, with intent to murder a white man. Counsel protested and objected five times about the prejudicial remarks, but the same were ignored by the trial judge.

Insofar as his contention on the second statement is concerned, the appellant relies on seven cases from this jurisdiction, namely, Hardaway v. State, 99 Miss. 223, 54 So. 833; Moseley v. State, 112 Miss. 854, 73 So. 791; Garner v. State, 120 Miss. 744, 83 So. 83; Walton v. State, 147 Miss. 17, 112 So. 601; Roby v. State, 147 Miss. 575, 113 So. 185; Harris v. State, 209 Miss. 141, 46 So. 2d 91; Reed v. State, 99 So. 2d 455 (Miss.)

A study of these cases shows that, in every instance, except one, the defendants were Negroes and the State witnesses were Whites. In the Garner case, supra, although the victim of the rape was a young Negro girl, the exhortation to the jury by the prosecuting attorney was that they should not turn loose a brute of the defendant's race on the community.

Besides, in each instance there was an express appeal to racial prejudice, and the veracity of the witnesses, both Negroes and Whites, was expressly pitted against each other. In each case there were objections to the pungent arguments and appeals to prejudice by the prosecuting attorneys. In every case the trial judges either overruled the objections or declined or failed to rule on them at all. They did not disapprove or condemn such arguments nor did they admonish or direct the juries to disregard the same. Thus the judges did not, in any way, seek to effect the erasure of such prejudicial matters from the minds of the jurors.

■■ ■ Manifestly the cases, which the appellant has cited, are not indicative of what the court should hold in the present case. In this case, when the objection was made, the trial judge promptly sustained it. When coun-

sel then moved for a mistrial, the court overruled it but directed that the record should show that "I am instructing the jury to disregard" the speaker's statement. In the absence of the exact words which the judge used for that purpose, it must be assumed that they fully covered the matter.

This Court has recognized that, when an objection is made to arguments and the same is sustained by the court, usually the ill effect of the statement, if any, is corrected. In the case of Herrin v. State, 201 Miss. 595, 29 So. 2d 452, a manslaughter case, the district attorney, in his closing remarks to the jury, said: " 'Gentlemen of the jury you can acquit the defendant on this charge and let him go free, and if you do he may kill another person, and the next time it may not be a colored person,' to which the defendant 'duly objected, and which objection the court duly sustained.' " The court, in dealing with this objection, said that "we are of the opinion that while the remarks of the district attorney constituted an appeal to race prejudice, and should not have been made, the action of the trial court in promptly sustaining an objection thereto was sufficient to prevent his overruling of the motion for a mistrial from constituting a reversible error, under all the facts and circumstances of this case." See also Pitts v. State, 211 Miss. 268, 51 So. 2d 448, an appeal from a life sentence; Thomas v. State, 200 Miss. 220, 26 So. 2d 469, a manslaughter case; Moon v. State, 176 Miss. 72, 168 So. 476, a death sentence; Bufkin v. State, 134 Miss. 116, 98 So. 455; Cavanah v. The State, 56 Miss. 299.

In the Pitts case, supra, dealing with the five statements in the bill of exceptions as improper but not sufficient to cause a reversal, the Court said: "After each of the statements, the court sustained objections to it. The cumulative effect on a jury of the trial judge's sustaining a devendant's objection to argument and ofter

admonishing the state's attorney to stay within the evidence usually has the effect of curing the improper conduct and prejudicing the state's rather than the defendant's case.'' In the Thomas case, supra, in overruling the claim of prejudice from the alleged injection of the racial issue into the case, the Court said: ''The record shows that when the irregularities occurred the court not only sustained the objections made to them, but in each case the court expressly admonished the jury to disregard the matter of which the complaints were made; and this direct admonition to the jury by the court was sufficient to cure the improper conduct.''

All of the cases show that the evil inveighed against in prejudicial argument of this kind is the appeal to racial prejudice and the arrayal of White against Negro.
■■ The statement here under review cannot be held either to intend, or to produce, that result. In the explanation of punitive damages, counsel was merely saying that people in this state and country do not settle alleged reflections on their honor as they did in the old days. On the contrary the law recognizes the existence of injuries on that account, and provides for retribution in a lawful way by the award of damages without resort to six-guns or violence. Such was the purpose of the Anti-Dueling Statute. Whether this fact of history is known to the great masses of the people or not, at least the change in the method of settling such affairs is now known because the original practice has been greatly mitigated. Jurors in the county where this trial occurred are required to be men ''of good intelligence, sound judgment and fair character.''

There would be no difference between saying ''if the defendant had done this to the plaintiff'' and in saying ''if Aaron Henry had done this act to Ben Collins.'' There simply was no appeal to racial prejudice.
■■ The trial judge, out of an abundance of caution, sustained the objection and instructed the jury

to disregard the statement of counsel. If it could, by the wildest stretch of the imagination, be said that any harm had resulted, manifestly such harm must have been eradicated from the minds of the jurors.

There is this added fact in connection with this assignment. The appellant made no claim in his motion for a new trial that he should be awarded this relief because of error in the refusal to grant a mistrial based on prejudicial argument to the jury by counsel for appellee.

██ ██ The trial court had no opportunity whatever to review, following the completed trial, his action in that particular matter. This Court has repeatedly held that, unless the point is preserved in the motion for a new trial, the contention that the verdict is contrary to the great weight of the evidence cannot be reviewed here. Youngblood v. State, 216 Miss. 202, 62 So. 2d 218, and authorities there cited. Prejudicial evidence and prejudicial arguments are so closely akin that they should be treated in the same manner. There is no reason why the same rule should not be applicable to both. If one is to profit from the failure of the court to overrule a motion for a mistrial because of prejudicial argument, such point should be preserved by including it in the motion for a new trial. Inasmuch as it had not been heard of until its assignment in this Court, it must therefore be viewed as an afterthought. Consequently there was no error on the part of the court in this respect.

## THE REFUSAL OF THE COURT TO PERMIT THE FILING OF A PLEA OF QUALIFIED PRIVILEGE

██ ██ After the appellee had rested his case, the appellant asked leave to amend his answer and set forth the defense of qualified privilege, based on fair comment. This motion was denied on the ground that it had been filed too late. Be that as it may, however, the measurable privilege of publications, dealing with public

officials, requires that such publications must be within the bounds of fair comment and must not be motivated by actual malice.

In the case of Krebs v. McNeal, 222 Miss. 560, 76 So. 2d 693, at p. 576 of the State Report, 76 So. 2d 699, this Court cited and quoted from 33 Am. Jur., Libel and Slander, Sec. 169, pp. 161-164, as follows: "Although there are a few decisions to the contrary, the great weight of authority supports the view that publications dealing with political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the public interest involved therein. The principal limitations upon the rule are that the statements must be within the bounds of fair comment and must not be motivated by actual malice * * * The rule does not, however, place such persons wholly without the protection of the law, and although there is authority to the contrary, it is generally held that accusations of crime, dishonesty, fraud, corruption, immorality, etc., and imputations of dereliction of duty, favoritism, or misconduct in office, are not privileged." See also Edmonds v. Delta Democrat Publishing Company, 230 Miss. 583, 93 So. 2d 171; Scott-Burr Stores Corporation v. Edgar, 181 Miss. 486, 177 So. 766; Kroger Grocery & Baking Company v. Harpole, supra; Louisiana Oil Corporation v. Tenno, 173 Miss. 609, 157 So. 705; Hodges v. Cunningham, 160 Miss. 577, 135 So. 215; Hines v. Shumaker, supra. Likewise, the Law of Torts, Harper and James, p. 457, is to the effect that proof of actual malice defeats the qualified immunity of fair comment.

The statements in this case accused the appellee of being guilty of crimes. There was no evidence to sustain such a charge. The appellant, who was called by the appellee as an adverse witness in the presentation of his case, had, in no way, offered any suggestion of a qualified privilege under the theory of fair com-

ment. Consequently, such a defense would have been without avail. The appellant therefore could have suffered no injury whatever from the denial of his motion in this particular.

## THE RESTRICTION OF LIBEL INFRINGES THE FREEDOM OF SPEECH

██ ██ This contention is utterly untenable. The authorities are legion as to the right to call a person, guilty of malicious libel, into account for his defamation. The Supreme Court of the United States in Konigeberg v. State Bar of California, 366 U. S. 36, 81 S. Ct. 997, 6 L. Ed. 2d 105, said that the First Amendment is not an absolute. See also Near v. Minnesota, 283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357.

## THE AMOUNT OF THE VERDICT

The appellant contends that the verdict in this case is grossly excessive and evinces passion and prejudice. Under the law, damage is presumed to result from a malicious libel and, of course, it followed from the publication of this malicious libel. Reckless negligence in the infliction of a personal injury would afford a remedy to the victim. As was said in Jarnigan v. Fleming, supra, ''Character is far more sacred than property, and should be protected by courts and juries with watchful care. Persons who injure the character of others, ought to be no less answerable to justice than those who injure property.''

██ ██ When the words are prompted by malice, punitive or exemplary damages may be awarded. Kroger Gro. & Bk. Company v. Harpole, supra; Interstate Company v. Garnett, 154 Miss. 325, 122 So. 373; Gardner v. Martin 123 Miss. 218, 85 So. 182; 53 C. J. S., Libel and Slander, Sec. 260 b., p. 373. In the Garnett case, supra, this Court let $15,000 of a verdict of $25,000 stand, although in that case it was necessary for the

jury to determine, because of the susceptibility of two potential meanings of the words, whether or not the particular words were slanderous. Too, that case was decided in 1929 when dollars had greater purchasing value. In that case, there was proof as to the financial worth of the appellant, whereas there is no evidence on that phase of the case in the present record. But this Court cannot be blamed for lack of that information.

When published statements are considered and reduced to writing, there is study and concentration on the subject matter. This clearly establishes deliberate intent, evincing malice if the same is false. On the contrary, a sudden loss of temper may be the reason for the utterance of a defamatory statement. For that reason, it may be that a jury would be impelled to award a larger verdict for injuries flowing from libel than from slander.

■■ ■ According to the evidence, the appellee was thirty-two years of age, married, and the father of one child. He was a dedicated officer, having been engaged in the important occupation of law enforcement since 1956. He was striving to make a successful life career in that phase of human endeavor. His salary at the time was $600 per month. He had noted ill effects and symbols as a result of the defamation, and these were not restricted to the local area.

The Court is unaware of any rule whereby it can justly reduce the amount of this verdict which was solemnly adjudged by the jury. That being true, the Court is not in position to say that the verdict is grossly excessive or that it evinces passion or prejudice on the part of the jury.

The Court finds no reversible error in the case and the judgment of the trial court must therefore be affirmed.

Affirmed.

*Kyle, McElroy, Rodgers and Jones, JJ.,* concur.

## ON MOTION OF APPELLANT TO SET ASIDE FORMER JUDGMENT AND ENTER JUDGMENT FOR HIM AGAINST APPELLEE

LEE, C. J.:

The verdict of $15,000 and the judgment of the trial court in the above styled cause was affirmed by this Court on December 2, 1963. Henry v. Collins, 253 Miss. 34, 158 So. 2d 28 (1963).

Thereafter the appellant Henry prosecuted an appeal to the Supreme Court of the United States, and that Court, at its October 1964 Term, 380 U. S. 356, 85 S. Ct. 992, 13 L. Ed. 2d 892 as shown by its mandate of April 23, 1965, reversed the judgment heretofore rendered by this Court, awarded judgment against Benford C. Collins for costs of $100.00 on that appeal, and remanded the cause to this Court for further proceedings not inconsistent with the opinion of that Court.

Consequently, this Court, in the circumstances, must yield to the judgment of the Supreme Court of the United States and its mandate therefor and direct that the judgment heretofore affirmed by this Court be reversed and judgment be rendered here for the appellant, Aaron Henry, and against Benford C. Collins, together with the costs adjudged in that Court in the sum of $100.00, and already taxed, and the costs to be taxed on the appeal to this Court from the trial court.

The motion to sustain and the judgment for appellee is reversed, and judgment for the appellant is rendered here.

All Justices concur.